UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 12-24458-cv-KING

JORGE SALGADO and BARBARA
ALFARO, individually and as Co-
Personal Representatives of the Estate of
George Salgado, deceased,

    Plaintiffs,

v.

CITY OF WEST MIAMI, a Florida
Municipal Corporation, MYRNA LOPEZ,
and RAUL BARON,

    Defendants.
_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

THIS CAUSE comes before the Court upon Defendants Myrna Lopez and Raul Baron's Motion for Summary Judgment (DE 113) (the "officers' motion") and the City of West Miami's Motion for Summary Judgment (DE 104). The motions are fully briefed. Plaintiffs, in their Consolidated Response to both West Miami's and the officers' motions for summary judgment (DE 131),[1] voluntarily dismissed their § 1983 claim against the City (Count XII). Plaintiffs' remaining Counts are I, III, IV, VII, and VIII—the § 1983 claims against Baron and Lopez and

---

[1] Plaintiffs did not comply with Local Rule 56.1 in that their statement of material facts does not correspond with the order and paragraph-numbering scheme used by Defendants. Defendants urge the Court, on that basis alone, to deem Defendants' statements of material facts admitted. The Court declines to do so, albeit Plaintiffs' noncompliance has made the Court's review of the instant motions more burdensome.

the Florida Wrongful Death claims against all remaining Defendants.[2] In this Order, the Court addresses Baron and Lopez's defense of qualified immunity from Plaintiffs' § 1983 claims and reserves ruling on Plaintiffs' Wrongful Death claims (except as to Defendant Lopez).

## I.   Background

The relevant undisputed material facts are as follows. On April 12, 2012, Israel Rodriguez was visiting his friend, Maritza Lopez, for lunch at her efficiency apartment. DE 112, ¶ 1 n.2. Rodriguez answered a knock at Maritza's door to find two people standing outside: Maritza's next-door neighbor, Amanda Nazario,[3] and an entirely nude Jorge Salgado.[4] *Id. See also* DE 132-4, at 32:6–8. Salgado, sweating and with bulging eyes, asked Rodriguez for marijuana or cocaine. DE 132-4, at 32:14, 35:16–18. Rodriguez stepped outside, closed the door behind him, and told Salgado that he must go indoors because he cannot be naked outside. DE 112, ¶ 1 n.2. At that, Salgado attacked Rodriguez. He clawed at him, tried to bite him and knock him to the ground, tore at his clothes, and grappled with him. *Id.* Nazario fled. DE 132-4, at 37:21–22. Rodriguez, who was 70 years old at the time, managed to trip Salgado,[5] escape back into Maritza's apartment, and call the police. *Id.* at 38:21–23, 42:6.

Officer Raul Baron and Sergeant Myrna Lopez of the City of West Miami were nearby. DE 112, ¶ 1. They responded as back-up units to a dispatched call for Miami-Dade County officers who were not as near to the scene. *Id.* The dispatched call reported a naked man beating a female. *Id.* Additional information was relayed that the naked man also attacked another victim

---

[2] All causes of action against Miami-Dade County and its officers have been dismissed.
[3] Nazario's and Maritza's efficiency apartments are joined together, next to a courtyard behind a house. The efficiencies are accessible through a pathway on the side of the house. DE 132-4, at 33:3–7.
[4] Salgado was wearing an ankle monitor because he was on house arrest for credit card fraud. DE 112, ¶ 21.
[5] "Unfortunately - - or fortunately," Rodriguez said, "I know how to defend myself a little bit." DE 132-4, at 72:24–25. "I've had a lot of street fights. I watch a lot of boxing. I like action." *Id.* at 73:9–10.

2

by trying to bite him. *Id.* Lopez arrived at the scene and met Rodriguez, who had ventured out of Maritza's apartment once again to meet the arriving police officers near the street.[6] *Id.* at ¶ 2. Lopez observed redness from Rodriguez's chin down to his throat, and could see through his torn clothing. *Id.* Soon Baron arrived, and Rodriguez led the two officers down a pathway on the side of the house to the back of the property, where the efficiencies are. *Id.* at ¶ 3. He warned them that Salgado might attack. *Id.* at ¶ 2. The officers unholstered their tasers as they reached the open door of Nazario's apartment. DE 132-4, at 48:1–5.

Baron stood in front of the doorway and Lopez stood against the wall, hidden from Salgado's view. *Id.* at 48:9–13. Baron saw that Salgado was naked, sweating profusely, pacing back and forth, and highly agitated; he shouted and growled. DE 112, ¶¶ 3–4; DE 131, ¶ 10. Baron repeatedly told Salgado to calm down, but Salgado charged at Baron through the doorway. DE 112, ¶¶ 4–7. Baron and Lopez deployed their tasers at Salgado in probe mode. *Id.* at ¶ 8.[7] The probes from Baron's taser struck and attached to Salgado in his upper torso, close to his heart. DE 131, ¶ 14. Lopez's taser struck Salgado on his right side. *Id.* Salgado got within three to five feet of Baron before the taser prongs struck. DE 112, ¶ 9.

Salgado fell to the ground outside of the apartment. *Id.* at ¶ 10. After Baron's first five-second taser cycle concluded, he discharged his taser four more times in probe mode. According to the taser download report, each discharge constituted one five-second-long cycle. The second cycle began three seconds after the first; the third cycle began one second later; the fourth cycle began two seconds later; and the fifth cycle began 43 seconds after that. DE 132-10. Baron insists that during the fifth discharge, one of the two prongs had dislodged from Salgado's chest,

---

[6] Salgado saw Rodriguez and briefly chased him, but retreated when Rodriguez neared the street. DE 132-4, at 43:23–25.

[7] *See* below, Part III.B.1 (describing the operation and effect of the taser in probe mode).

3

thereby decreasing the effectiveness of the taser. DE 132-1, at 72–73. Plaintiffs do not genuinely dispute this; however, the taser download reports do not distinguish between cycles where both prongs are connected to a person and those where only one prong is connected. DE 112, ¶ 10 n.6. Lopez tried to discharge her taser only one more time after her initial deployment, but it malfunctioned. *Id.* at ¶ 11.

Taken in the light most favorable to Plaintiffs, Salgado turned face down on his stomach when Baron told him to do so. DE 132-4, at 55:12–15. From the first taser deployments to Baron's fifth discharge, Salgado became incapacitated during the taser discharges and then moved again. He convulsed, hit his head against the ground, rolled around, and crawled as far as from one corner of the outdoor courtyard to the other. DE 132-4, at 55, 106, 128. Baron shouted further commands at Salgado (to keep still, to put his arms behind his back) to no avail.

Up to this point, Rodriguez observed everything that has been described.[8] Then two Miami-Dade police officers and two West Miami police officers arrived. *Id.* at 57:24–25. One of the officers led Rodriguez away. Rodriguez neither saw nor heard any further uses of force against Salgado. *Id.* at 81.

With the other officers arrived and Rodriguez gone, Baron moved in to handcuff Salgado. DE 112, ¶ 16. But Salgado, who at this point had been tased in probe mode at least five times already, stood up, faced Miami-Dade officer Diaz, and charged at him. *Id.* Baron deployed his taser at Salgado in probe mode (for the sixth time) but missed. *Id.* Miami-Dade officer Morales deployed his taser in probe mode and hit Salgado, who fell before he reached Diaz. *Id.* at ¶ 17.

---

[8] In Rodriguez's opinion, Salgado could have easily been handcuffed. *Id.* at 108. Even assuming that this opinion would be admissible at trial (there is a pending motion to exclude it), it does not alter the analysis herein or create a genuine issue of material fact. The fact that, in Rodriguez's opinion, Baron and Lopez could have easily handcuffed Salgado does not bear on the reasonableness of the force that Baron and Lopez used, which is measured objectively.

4

As Salgado fell, Baron punched and kicked him. *Id.* With Salgado on the ground again, Baron and other officers struggled to handcuff Salgado. *Id.* at ¶ 19. Officer Morales repeatedly discharged his taser—eight times (at five-second cycles each) in just over two minutes, according to the download report. DE 132-10. Salgado rolled on the ground and tried to bite Baron's leg. DE 112, ¶ 18. He managed to stand up again and was again taken down. DE 132-1, at 85:18–86:19. Baron tried to tase Salgado a seventh, eighth and ninth time, these times in drive stun mode. *Id.* Baron believes that these last three uses of his taser did not make contact with Salgado because Salgado was rolling and avoiding the taser strikes. *Id.* But Plaintiffs' expert, Dr. John Marraccini, identifies one drive stun marking on Salgado's leg. DE 132-5, at 49; DE 108-2, at 8.[9]

With multiple officers struggling and holding Salgado down (including Lopez, who held Salgado's legs), Miami-Dade officer Cairo managed to put Salgado in handcuffs. DE 112, ¶¶ 19–20. In addition to struggling, Salgado spit and shouted incoherently. *Id.* at ¶ 20. Miami-Dade officers placed leg restraints on him and emergency medical personnel transported him to Larkin Community Hospital. *Id.* at ¶¶ 20–22. There Salgado registered a fever as high as 105 degrees. *Id.* at ¶ 22. He died the next morning at approximately 5:30 a.m., about 15 hours after Baron and Lopez's initial taser deployments. *Id.*

## II.    Standard on Motion for Summary Judgment

Summary judgment is appropriate where the pleadings and supporting materials establish that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it is may determine the outcome under the applicable substantive

---

[9] There are pending motions to exclude Marraccini's opinion, but Defendants do not attack this finding of his.

5

law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party must show specific facts to support that there is a genuine dispute. *Id.* at 256. On a motion for summary judgment, the court must view the evidence and resolve all inferences in the light most favorable to the nonmoving party. *Id.* at 255. In reviewing the record evidence, the Court may not undertake the jury's function of weighing the evidence or undertaking credibility determinations. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010).

### III. Whether Baron and Lopez are Entitled to Qualified Immunity[10]

Baron and Lopez assert that they are entitled to qualified immunity from Plaintiffs' § 1983 claims. To resolve this, the Court must consider the following two questions: First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, assuming a constitutional violation, or if a constitutional violation is shown, did the officer's conduct violate clearly established law? *Id.*[11]

Plaintiffs contend that the force Baron and Lopez used was excessive under the Fourth Amendment, "which guarantees citizens the right 'to be secure in their persons ... against unreasonable ... seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Id.* at 396. Rather, it "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the

---

[10] Whether the officers' uses of force against Salgado, including potentially 19 taser discharges in probe and drive-stun mode, caused or contributed to Salgado's death, is a hotly disputed issue in this case, central to Plaintiffs' state law wrongful death counts, and the subject of disputed expert testimony. For purposes of the qualified immunity analysis, however, the Court concludes that it need not resolve the cause-of-death issue.

[11] Although it is not mandatory to do so, the Court will decide the first question first, as the Supreme Court recommends. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

countervailing governmental interests at stake." *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). It "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Garner*, 471 U.S. at 8–9).

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," *Johnson v. Glick*, 481 F.2d, at 1033, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–97. The inquiry "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

### A. Defendant Myrna Lopez

Plaintiffs have failed to show that Lopez's uses of force were unreasonable. "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. The undisputed facts show that Lopez's only uses of force against Salgado were that (1) she deployed and discharged her taser at Salgado in probe mode as Salgado charged toward her and Baron; and (2) she held Salgado's legs as other officers struggled with and handcuffed Salgado. These actions were clearly reasonable. *See, e.g., Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (concluding that the single use of a taser

against a "hostile, belligerent, and uncooperative" suspect did not constitute excessive force). Lopez is entitled to qualified immunity.[12]

## B. Defendant Raul Baron

### 1. Plaintiffs Have Sufficiently Shown a Constitutional Violation

The governmental interests at stake in this case are of the highest importance. They are no less than the interests in safeguarding citizen and officer alike from violent and dangerous behavior. That the crimes Salgado committed were severe, and that he at moments violently resisted arrest, are beyond dispute.

Of high importance too are Salgado's Fourth Amendment interests in being free from unreasonable seizures of his person. Plaintiffs have shown enough facts to support the conclusion that the nature and quality of the intrusions into those interests were disproportionately severe. According to Mike Brave of Taser International, Inc. ("Taser"), on whose deposition testimony Defendants rely, the Taser X26 used by Baron and Lopez is a single-shot device. DE 107-6, at 21:17.[13] When an officer first pulls the taser's trigger in probe mode, an electrical spark causes two nitrogen capsules to propel two probes outward at eight-degree angles. *Id.* at 21:23–22:1, 22:7. If the probes hit a person, hooks at the end of the probes enter a person's skin or attach to his clothing. *Id.* at 22:3–6. They remain connected to the taser by thin, insulated wire. *Id.* at 22:1–2. Thus attached, the taser delivers an electric charge, assuming there is a completed circuit (meaning the electricity flows from the taser through one of the probes, into the person, and then

---

[12] For the same reasons, Plaintiffs have failed to show, as they must under Florida's Wrongful Death Act, that Lopez "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a). Therefore, Lopez is entitled to summary judgment on Count IV of Plaintiffs' Second Amended Complaint.

[13] For Brave's deposition, the Court cites to the transcript's pagination rather than that of the ECF docket entry.

back through the other probe to the taser). *Id.* at 22:11–18. Although the taser is powered at up to 50,000 volts of electricity, a person thus tased receives less than 3,000 volts. *Id.* at 35:1–11.

The precise effect that a taser has on a person thus tased depends on many factors, including what the probe spread is (i.e., how far apart the probes are when they attach) and the level and length of electric charge that is actually delivered to the person. *Id.* at 22:19–23:2. Other factors include what part of the body the probes attach to, how much body mass the probes encounter, or even how much salt a person has in his system. *Id.* at 38:8–18. Depending on a combination of these and other factors, the taser might only cause localized pain of varying severity. *Id.* at 45:19–23. Baron describes his own experience being tased (during his training) as "the worst pain I've ever felt." DE 132-1, at 25:12–13. The taser might also cause neuromuscular incapacitation, which is an involuntary tensing of the muscles, such as might cause a person to "lock up like a board and fall over." DE 107-6, at 10:19–11:5.[14] *See also id.* at 46:24–47:2 ("if I've got an 18-inch probe spread on you with a full delivered charge, either front or back, you can be King Kong, and you're going to go to the floor . . . .").

The record supports Plaintiffs' contention that Baron was familiar with and had been trained on the most updated Taser X26 training materials provided to law enforcement agencies by Taser. DE 132-1, at 26:24–27:1; DE 107-1, at 2. The version of Taser training materials and warnings in effect on April 12, 2012, was "Version 18." DE 107-6, at 100:7–15. Version 18 contains the following comments and warnings: (1) "Officer[s] should consider that ECD [electronic control device] exposure for longer than 15 seconds (whether due to multiple applications or continuous cycling) may increase the risk of death or serious injury," DE 132-11,

---

[14] The taser download reports do not distinguish between cycles where both prongs are connected to a person and those where only one prong is connected. DE 112, ¶ 10 n.6. Neither do they inform how many seconds of electrical charge were actually delivered to a person, or their degree of effectiveness. DE 107-6, at 61:19–24.

at 4; (2) the risk of the ECD causing cardiac arrest is very low (approximately one in 100,000 applications), but "[t]he further an ECD dart is away from the heart, the lower the risk of affecting the heart," *id.* at 31; (3) "[t]he application of the ECD is a physically stressful event," *id.* at 36; (4) "[w]hen possible, avoiding ECD chest shots reduces the risk of affecting the heart," *id.* at 47; and (5) "[i]n a physiologically or metabolically compromised person any physiologic or metabolic change may cause or contribute to death or serious injury." *Id.* at 51.

It becomes clear that Plaintiffs have shown enough facts which, if credited by the factfinder, would support a conclusion that the force Baron used was unreasonable. First, the disputed facts of this case bring into sharp relief *Graham*'s command that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). For in this case, Baron's decisions to tase Salgado the second, third, and fourth times were each made in seconds. Baron's decision to tase Salgado the third time was made in a literal split second.

Even granting Baron this "allowance," the near-instantaneous re-discharges between each of Baron's first four cycles creates a genuine dispute over the reasonableness of the discharges. Baron claims that each discharge was in response to Salgado's refusal to follow additional commands given in the intervals between discharges. DE 132-1, at 40:17–19 ("Each additional deployment of my taser was a result of not following verbal commands"). *See also id.* at 39:23–40:1 ("I allowed Salgado to recover from the five second cycle of each tasing, I issued him verbal commands. Salgado would not respond to my verbal commands."). The taser download report contradicts this and supports the inference that Baron's second through fourth discharges

were unprovoked by noncompliance with orders. This weighs against Baron, especially in light of the record developed in this case as to how severe an intrusion the taser discharges are—particularly given the probes' proximity to Salgado's heart, the excess of 15 seconds of discharge, and Salgado's evident "physiologically or metabolically compromised" state, all of which were factors Baron knew to increase the risk of death.

Second, Rodriguez's description of Salgado's behavior materially contradicts Baron's. According to Rodriguez, Salgado complied with Baron's command to go "belly down." DE 132-4, at 55:12–15. Rodriguez acknowledged that Salgado "would comply one moment and then move" and that he moved along the ground, as far as from one end of the courtyard to the other. *Id.* at 128:21–22. But Rodriguez stated that Salgado's movements were "not aggressive," *id.* at 58:10–13, and that "he [Salgado] didn't try to stand up at any moment . . . ." *Id.* at 106:15–19. This testimony creates a genuine dispute over whether such significant intrusions as three successive taser discharges in probe mode were reasonably proportionate to the threat of harm Salgado posed "at the moment." *Graham v. Connor*, 490 U.S. 386, 396 (1989).[15] Given the genuinely disputed facts regarding Salgado's behavior and given the severe and potentially fatal intrusion of the taser discharges, "a constitutional violation could be found." *Saucier v. Katz*, 533 U.S. 194, 207 (2001).

2. The "Clearly Established" Inquiry

Although Plaintiffs have shown enough facts to support a constitutional violation, Baron would still be entitled to qualified immunity if his conduct did not violate clearly established law. *Id.* at 201. The "salient question" to ask in the "clearly established" inquiry is whether the state of the law at the time of the incident gave "fair warning" that the alleged conduct was

---

[15] The undisputed fact that Salgado later stood up and charged at another officer does not alter this conclusion. The prohibition against viewing the facts in hindsight must cut both ways.

11

unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "'[F]air and clear warning'" provided by prior caselaw is "sufficient to preclude the defense of qualified immunity at the summary judgment stage." *Id.* at 746. For law to be "clearly established," the facts of previous cases do not need to be "'materially similar'" to those at issue in the case before it. *Id.* at 741. *See also id.* at 742 (disapproving of a "rigid, overreliance on factual similarity"). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741.

This case presents novel factual circumstances. Aside from surface analogies respecting the fact of a violent or resistant suspect, or the fact of numerous taser discharges, a careful review of the authorities cited by the parties reveals no precedent that is not "'distinguishable in a fair way'" from the present circumstances. *Vinyard v. Wilson*, 311 F.3d 1340, 1351–52 (11th Cir. 2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Therefore, this Court looks to "broad statements of principle in case law [that] are not tied to particularized facts and can clearly establish law applicable" to the facts of this case. *Id.* at 1351.

It was clearly established on April 12, 2012, that "unprovoked force against a non-hostile and non-violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment." *Fils v. City of Aventura*, 647 F.3d 1272, 1289 (11th Cir. 2011). As detailed above, Plaintiffs have shown enough facts which, if credited by the factfinder, support the conclusions that Salgado complied with Baron's initial order to go belly down; that certain of Baron's successive taser discharges were unprovoked by noncompliance with orders; that the force used was potentially fatal; and that to the extent Salgado did not comply with orders, his noncompliance consisted of merely rolling on the floor or crawling. These disputed facts, when construed in the light most favorable to Plaintiffs, bring Baron's conduct—at least his second

through fourth taser discharges—well within the ambit of the above-stated clearly established law, such that the unlawfulness of his conduct would be clear to any reasonable official. Baron is not entitled to qualified immunity.

### IV. Conclusion

Therefore, it is **ORDERED, ADJUDGED, and DECREED** as follows:

1. That Defendants, Raul Baron and Myrna Lopez's Motion for Summary Judgment **(DE 113)** be, and the same is, hereby **GRANTED in part and DENIED in part**.

    a. Defendant Myrna Lopez is granted summary judgment on Counts IV and VIII of Plaintiffs' Second Amended Complaint.

    b. Defendant Raul Baron is denied summary judgment on Count VII of Plaintiffs' Second Amended Complaint and is denied qualified immunity.

2. That the City of West Miami's Motion for Summary Judgment **(DE 104)** as to Plaintiffs' voluntarily dismissed § 1983 claim (Count XII) be, and the same is, hereby **DENIED as moot**. That same Count XII of Plaintiffs' Second Amended Complaint is hereby **DISMISSED with prejudice**.

3. That the Court hereby **RESERVES RULING** on Plaintiffs' Wrongful Death claims against Defendants Baron (Count III) and the City of West Miami (Count I).

**DONE and ORDERED** in Chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, Florida, this 4th day of February, 2015.

/s/ James Lawrence King
JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF FLORIDA

cc:   All Counsel of Record